May it please the Court. This is a pretty complex case, but I think it boils down really to three issues. One is the claim construction, two is the prosecution history estoppel, and number three is one factual issue, and it has to do with the binder on the Amneal product. And I think all of those can really resolve every issue. Everything is before the Court. But the meaning of a marquise group within a comprising claim is key here, isn't it, to your appeal? It is. It is. It is. It is key. The difference between many cases and this case is the specific language that's in these marquise groups. And this goes to Judge Toronto, your dissent in multi-layer where you have to look at the specific words. Right, but the particular ground of that dissent is not an issue here. That was about a question whether genus-species relation was a necessary part of this, and we don't have that. Correct, correct, but I took the point from your dissent that you really need to look at the words, and the words here are different than in multi-layer and in other marquise cases. The words here are similar to the in-ray Krish case. Some judges think that dissents don't count. Well, that may or may not be, Your Honor, but I'm just taking some But I think it's a good one in that you need to look at the words, and the words are important, and the words that are important here are the at-least ones. So if you look at that claim in its totality, you have comprising, which is open-ended. You have at least one, which Krish and Manisman say suggests that there's something else that's in that group or something else you can have that serves that function, and then you have... Does at least one override the two cases which are multi-layer and Shire? Yeah, well, I don't know about... That's your problem, multi-layer and Shire, but does at least one override those holdings? Yes, it does, Your Honor, and the difference is the existence of the language at least one. So that language, if you look at Krish, what Krish says is that that implies that there's something else, and so that language is not in multi-layer, and it's not in Shire. Shire, for example, uses two... It nests consists of and consisting of, so that's a double in there. Here, if you look at the language, you have the comprising, which is open-ended, the at least one, which is not either in multi-layer or Shire, and then on top of that, you have the end mixtures thereof at the end of the binder term, and also the disintegrate term, and so what that means is, according to multi-layer, multi-layer determined this, is that the mixtures refer to the excipients that's the at least language having to have a different meaning than the end mixtures thereof, and the only meaning it can have in this context, consistent with the Krish case and a management case, is that something else is allowed. Yes, Your Honor. It is your view, and important to your view, that, well, let's just think about binders are permissible, the percentage ranges have to be met only by the listed ones. Correct. So that you could have, I forget what the rate is, is this the one to five, or is that the other one? Yeah. I have it. Yeah, one to five percent. The binder is the one to five. So that you could have 20% of binders, but as long as 15% of that 15% was made up of unlisted ones, that would be met. That would be technically correct, I think, Your Honor, but there is it, but there is an element of claim, and I'm sorry, I hope I didn't cut you off there, there's an element of the claim, it's got to be useful to treat the disease, right? Yeah, yeah, right, right, right, but here's, I guess, why I'm asking. It seems to me that the origin story of this claim, where C and D get content filled in after an initial version, not quite initial, but almost initial version of the claim, that in which the diluent has listings, but the other two do not, that I'm finding it hard to read that initial version as saying something other than all the binders, and yet your view is that when the specification, that's the wrong term, the specificity was added by the examiner's amendment, that principle, that interpretation, that understanding fell away, and suddenly the totality of binders could be more than 55%. That seems problematic to me, so I guess I'd like to hear about that. Well, you can't go above 100%. I think really what you need to look at, though, is if you go back to what the nature of the invention is, and I think this is one thing that the district court did not do, if you look at what happened here, this was considered to be, the FDA called it, a magic bullet drug, right? And this active syncalcet was notoriously difficult, in fact, a nightmare to formulate, and so what happened here is they came up with the active, they came up with the salt version of it, and they came up with these excipient classes, right? And the way the classes are divided is by their common characteristics, and so what made this work was having those particular classes, right, which are embodied by the Marc Couch group, in those percentages, and so if somebody came along and added 1% of something else, is it fair that they can defeat the patent that way when it makes absolutely no difference in terms of what makes this invention what it is, right? This is this magic bullet drug, and so it was that unique formulation that made this work that hadn't worked previously before, and so, Your Honor, you mentioned 20%, I could say half a percent of something else, and so should somebody be permitted to beat the patent by putting in a half a percent of something that doesn't make any difference to the patent at all? That's what comprising is for. Yes, it is, but that's also why the at least is there as well, and so it's intended to cover those circumstances where somebody's trying to do that. In other words, the at least exacerbates the stringency of the Marc Couch, the usual stringency of the Marc Couch group. Yes, exactly, that's exactly right, Your Honor. The other point I want to make here, too, is that where the district court erred is in, Judge Stroner, you bring up the unlisted excipients, and I interpreted that as being something that's not disclosed in the patent, but when you have this formulation... What I meant by unlisted is not in the claim. Okay, well, yeah, all right, so maybe we should clarify this so that we're talking about the same thing. One thing the district court did is... Am I remembering right? I mean, the list in the claim matches the list in the spec. It does, but what the district court did is it was determining that one of the listed excipients, if it had a secondary function, was considering that to be an unlisted excipient, and that to me is particularly difficult in terms of the reasoning here and looking at the global... How you look at this invention in its totality and what it intended to accomplish, and so if I have a pre-gelatinized starch, which is a diluent, and it happens to have a secondary function as a binder, he was calling that to be... This is the issue in the Zydus claim. Yes, that's right. He was considering that to be an unlisted binder, and that would defeat the infringement claim, but that's supposed to be in there. The pre-gelatinized starch was supposed to be in the composition, and so because it was actually operating to have a secondary function, should not disqualify it or take it outside the scope of the claim as something that's unlisted. Now if somebody comes along and comes up with a different binder that's nowhere disclosed or isn't supposed to be in there, I still think that that's included by the claim, but that's different. But he has even excluded excipients that serve secondary functions, and that's not fair, and that's not consistent with the patent teaching. What the patent teaching is about is you take one excipient from each, at least one, from each of those categories, and it forms the formulation with the actor, and that's what's important, and if it serves a secondary function, it doesn't matter. I think one thing the district court found was that there was wild agreement that all of these excipients have secondary functions, or they can have secondary functions, and so everybody knew that, and people of skill in New York would read the patent that way, and so to call that an unlisted excipient I think just turns logic on its head, so that can't be the right interpretation. I think I misspoke. I got mixed up with my four-syllable words. I think I said exacerbates, ameliorates, is the point. Yes. Simpler is better. Okay, yes, I agree. So I think you have to look at the invention. That's something that the district court did not do. It didn't really look at the invention here. The other thing the district court didn't do, just getting back to this at least one language, the district court never addressed that. During the trial, it was attempted to be brought in, this issue, and the trial... But this is part of a claim construction argument. No, it was after the claim construction. But you are now making this as part of a claim construction argument. Yes, I am. So why would that be brought in at trial? Well, because the judge never considered the at least language. Well, it almost doesn't need to be construed. It's sitting right there. It has plain meaning. Well, I guess so, but there was a disagreement which came up about a week and a half before trial as to that language. In fact, ameliorate, I mean, there was a claim construction proceeding about a year or nine months before trial. This issue never came up. Ameliorate brings this up a few weeks before trial. The district court judge... You mean the whole issue of the closed versus open. That's what you mean by this issue. Yes. Yes, that's exactly right. This only was resolved a week and a half before trial. And the district court judge said, even after trial, he said, well, my ruling apparently caused confusion at trial, and there did, to me at least, seem like a lot of confusion at trial, and that he was not going to proceed with the case until this issue was resolved by the federal circuit. And so there was a little bit of confusion or maybe a lot of confusion on this issue. And the issue really is the closed versus open, and that's really driven by the at least one, which is not in multilayer and it's not in Shire. And so that issue should have been addressed. I think this court can address this de novo if you look at the language, because it can only mean... That at least one can only mean one thing in the context of that claim, and that means that the rest of that element is open. It can include unlisted, and the unlisted could be something that's not supposed to be in there, but it especially includes excipients that are supposed to be in there anyway, according to the patent, and they just serve a secondary function. Okay, so I've got two more issues I want to cover really quickly. One of them is the binder in the amnial product, this HPMC versus OPA-DRI. One thing that the district court did is it decided that this OPA-DRI, which is 92% HPMC, which is a listed excipient, district court said, no, this OPA-DRI is something different because it's in this... because it's combined with polyethylene glycol, a PEG, which is a plasticizer, it's not a binder, yet he concluded that the HPMC is a distinct chemical entity. So what he said is OPA-DRI is not HPMC... I think the part that I guess I'm remembering that he said that seemed to me to go beyond that was that with the plasticizers, the nature of OPA-DRI as a binder is different from the nature of the 92% HPC as a binder. And so you would, in fact, it's not like Funk Brothers, where you just put a couple of things in the package and they have nothing to do with one another. The district court found that when you put a couple of plasticizers with the HPC, the mixture is now a different binder from what HPC was alone. Well, that's inconsistent with his determination that the HPMC is a distinct chemical entity in OPA-DRI. What I would say about what you just said, Judge Toronto, is that what he was doing there was more of a DOE analysis rather than a literal infringement analysis. When you determine that HPMC is a distinct chemical entity in the OPA-DRI, and it constitutes 92% of the OPA-DRI and the other 8% has nothing to do with being a binder, it may be that the plasticizers... The district court found the opposite of the 8% has nothing to do with it being a binder. The district court said once you have that other stuff, it does have something to do with it being a binder. Well, it may have enhanced effects, but again, I think that's more of a DOE concept, right, in terms of a function-way result. Maybe you get a somewhat different result. That does not mean that the HPMC is not in the solution. It may have an enhanced binder function because of the peg, and just accepting that as true for the purposes of this argument, that does not mean that the HPMC is not there, and that was his factual ruling. If we have to go by clear error when it comes to the clear error standard when it comes to fact-finding, we should also be able to get the benefit of his other rulings, which is that HPMC is a distinct chemical entity in the OPA-DRI, which means it's a distinct chemical entity in the ANDA solution. Unless there's questions, I just want to move on to prosecution history estoppel because this is an important issue for us. Well, if you could be brief because we're running out of time. Oh, I'm sorry. All I want to say is that the one thing that made a difference and the one claim element that made the difference in the allowance was the narrowing of the range of the active. If you look at the excipient elements, they were never changed. All that happened was that the claims 6 and 8, which were the Marcouche groups, were moved into the independent claim, but there was no narrowing in response to the prior art. The only thing that was narrowed was the range of the active, and that's why the claims were allowed. So we don't even get to the issue of there may have been narrowing, but it certainly wasn't with respect to the binder Marcouche group. It was not for the purposes of patentability, and in any event, the narrowing of the binder was tangential, which is similar to the Lillard case. Okay, now before you sit down, we have a question about the cross appeal. We noticed that there are three of you on that side of the table. Were you planning on raising the cross appeal as a principal argument because I note that Mr. Maddox, you actually reserved a minute of rebuttal, which implies an opportunity for the other side to respond. Does that make sense as a way to approach the cross appeal? Were you speaking first? We were speaking first. Okay, I'm going to ask you a question about jurisdiction. Okay. So you should have that in mind. Okay. Okay. Well, in that case, all right, then we'll proceed. Now you plan to – well, I'm not sure how you plan to organize this, but you'll tell us as you go along. We've divided the 15 minutes we have among us. I did file it as a separate appeal. We were consolidated by the court, and so we do the best we can with what the court has given us. Okay. So you represent Zaidis, and you have a judgment of infringement against him. That's correct. I'm concerned about whether we have jurisdiction over the appeal from that, not about the other one, right? The other one is the Amnil-Piramal one. That one, there's a judgment in the district court of non-infringement, and we've had a bunch of cases that say, in that circumstance, the defendant can say, as long as this judgment sticks, we're happy litigation over. If it doesn't, we've got some invalidity defenses and counterclaims we're going to come back with. You're in the opposite position. You have a judgment that says you infringe. I can't quite – and I don't know of any cases where we have said there is a final judgment or what we don't have here, but even that there could be a Rule 54B judgment that allows you to say what happened here as to Zaidis. We're going to put the invalidity claims. We're going to dismiss them without prejudice. But if that judgment, the one you actually have in front of you, is affirmed, I assume you're not going to stand here and say, we hereby forego our invalidity defenses and counterclaims. You're going to want to raise them, right? I don't know. My client is right there. I could ask him. Well, in any event, are you aware of any precedent that allows a judgment that on its face, infringement, doesn't end the dispute because that judgment could be undone by the invalidity defenses? I mean, if you're prepared to say they're gone with prejudice, then that's one thing. But you shouldn't have to decide this by a 30-second conversation. Do you need help from a colleague? Come forward. May I? I'm sorry. As you know, jurisdiction wasn't raised on the brief. I know, but we're obliged to address it. I appreciate that. I'm just saying we're caught a little bit. I think that's a give up. That is Zaitis itself. I'm authorized to say that we give up the validity on it. Even if infringement is affirmed? Even if it's affirmed. Okay. That probably solves the problem. I would think so. I'm sorry. I'm not sure what else I can do. Okay. So may I? Claim construction. This case is just like Multilayer and Shire. They come in and the arguments keep shifting. In the briefs it was there's stuff in the specification that seems to indicate other things can be used. This is exactly what we had in Multilayer, and it's exactly what we had in Shire. The words, at least one, are not magical, and they do not exacerbate nor ameliorate. In 2003, this Court told patentees that if they wanted in Abbott, if they wanted to cover a combination of mixtures in their Marcouche groups, they should use language like, and mixtures thereof, or in at least one member of the group. But why doesn't at least keep you in the Marcouche group? So it basically enlarges the Marcouche group because it's part of it. No, at least one tells you that you can have multiple members of the Marcouche group, and mixture tells you you can have mixtures of those ingredients. And that's what you asked for in 2003 in Abbott. At least one of those recited? Yes. Now, as for why this doesn't really mean comprising, Judge Toronto, you put your finger on it. We started this as a claim of limited to 1% to 5% binders. Then the patent examiner said, you've got problems with the prior art, Creekmore, I believe. How about you do this? You put this Marcouche group in limited to these things. And now the result of that limiting amendment, according to Amgen, would be to have basically opened the amount of binder to anything you want. It doesn't have to be only up to 5%. This, by the way, also runs into the science that Amgen gave to the U.S. examiner as well as the European examiners in reporting their experiments about how the limitations on amounts of weight were what was critical to getting the desired effect. So the real thing that's going on in Krish, firstly putting aside the different standard, in Krish this court said, listen, the language requiring, quote, at least a portion, and that was in the claim language there, of nucleotides implies that the pending claims contemplate additional nucleotides. And the language back in Madison, it had one part that was at least one, but it had at least a portion. It's the portion that's causing the problem there. And I would suggest that this court has never said that using the signposts for mixtures and multiple combinations, that the court gave it back in 2003, has never held that that means consisting of with respect to a Marcouche group turns into comprising. It sort of defies common sense that it would, especially given this prosecution history. Now, turning to the errors here, yes, we put all our arguments in there. He did seem to change the burden of proof. All of a sudden it became Zaitis' job to rebut allegations. But mostly in ANDA cases, and you have many of them before you, these are consolidated trials. And the judge basically said, okay, you didn't meet your burden of proof, but I'm going to go find evidence from some other defendant in this trial I've consolidated for my convenience. I'm going to apply that expert opinion in a way that that expert himself refused to do, and in a way that contradicts my own finding of fact, that you cannot determine the function of PGS based on weight percent alone. And then I'm going to find you infringed. Now, this is going to lead to a bunch of very interesting consolidated trials because we at this table are competitors. Consolidation of trials is for the court's convenience. But doesn't that fact that you're competitors puts you on notice that you can't rely on the other people at your table as your friends for purposes of immunizing you from the effect of evidence that they put on? So let the word go out that if you're in a consolidated trial, you are now litigating against the patent holder who has a burden of proof, and you've been through in discovery. But don't worry, the patent holder doesn't have to worry about the burden of proof so much because afterwards if he can find other stuff from other people said about you. Plaintiffs all the time get to rely, unless there's some sort of procedural objection or something, to meet their burden by, among other things, evidence that the defendant puts on. Against that defendant, yes. But why not by any other evidence? Why not by any other defendants? Okay, well, and the litigation is going to change because we're going to start litigating against each other. And frankly, there should be a point at which consolidation doesn't affect the burden and quantum of proof you have to refute. And it shouldn't affect the patentee's burden of actually proving infringement. But even if you are going to say, great, open season, sorry generics, you're going to be fighting each other as well for the court's convenience. Even if you're going to say that, then when the court does reach out to grab some evidence, at least let's make it evidence that's not clearly erroneous. Well, that's a different argument. Well, but it's happened here. The judge said, well, I see from this expert, over 20% it won't be a binder, and so you infringe. And so you have failed to rebut the allegations. The actual expert refused to do that, said you can't do that. And even the fact that the court elsewhere had found as fact that you cannot tell from just the weight, and then it turned around and said, hey, I can tell from just the weight. The court got lost on this. It lost the forest for the trees. The court got the claim construction right. It's black-letter law. It's straightforward. There's nothing magical about at least one. And then the court lost the forest for the trees, and my client suffered. The court got confused and made some errors of law and fact. Thank you. I'm sharing your time with your colleagues. Okay, the next is Mr. Barkoff. I have a minute reserved for rebuttal. I cede that. Well, I saw you were saving a minute. It depends on what there is to rebut, I suppose. If you allow me more, but I know I've done it before, and I certainly don't want to short my colleagues. Okay. Mr. Barkoff. May it please the court, my name is Aaron Barkoff. I represent Paramal Healthcare in this case, one of the two defendants who prevailed below with a judgment of non-infringement. Counsel for Amgen said this is a complicated case. That may be true because there are three defendants here, and one is a cross-appellant. But for Paramal, this is a very simple case. This case is a textbook example of prosecution history estoppel. Amgen filed broad claims to a formulation comprising at least one binder. The examiner rejected the claims as obvious over prior art disclosing the active ingredient and formulations comprising binders and disintegrants. Amgen then amended the claims to recite a specific amount of sinicalcid from about 20 milligrams to about 100 milligrams. The examiner maintained the rejection, even in the face of that narrowing of the amount of sinicalcid. The examiner suggested adding a Marcouche group of four binders and another Marcouche group of three disintegrants. Amgen agreed to that examiner's amendment. Then the claims were allowed. And in allowing the claims, the examiner stated, the closest prior art fails to specifically disclose or render obvious the combination of components and in the amounts thereof set forth in claim two. There can be no credible dispute that the amendment adding the Marcouche groups to the claims was made for a substantial reason of patentability. Amgen relies heavily on their own... Can I just ask you? I think you said that after the absolute weight as opposed to the percentage weight of sinicalcid was added, the examiner rejected the claims again. Can you just give me the joint appendix page where that happened? Yes, Your Honor. It's 9457 through 9458. Your Honor, that's the examiner's amendment. I think I heard you say that before the examiner's amendment, the absolute weight was added and nevertheless the examiner again rejected it. I was not remembering that. There was not a formal office action per se, but if you look on appendix 9457, you'll see under examiner's amendment, an examiner's amendment appears below. Authorization for the examiner's amendment was given in a telephone interview with Alicia Russo on March 12, 2015, before the mailing of this examiner's amendment on March 25th. So there was an examiner-initiated interview where the examiner maintained the rejection and proposed a claim amendment adding the Marcuse groups. I'm sorry, I just want to be a little picky here. Where the examiner maintained the rejection. Show me where that is. Perhaps I shouldn't have used those words. Well, you know, it does make a difference. Their whole point is that the only important part of the amendment was the absolute weight of sinicalcid. This is what this debate is about. That is their point. If that were... Right, and one of the things they say is that the prior art that had been invoked had the same, or at least one of the same, maybe more than one, but at least one is probably all that matters, of the excipients. So the addition of the specificity as to excipients could not have mattered. Well, I disagree with that, Your Honor. Well, it doesn't? There were three pieces of prior art. One disclosing the active ingredient. That was van Wegenen. That's Amgen's patent on the molecule sinicalcid. The examiner combined that with two other articles disclosing pharmaceutical formulations that did not include sinicalcid. There were other pharmaceutical formulations disclosing compositions comprising a long list of binders and a long list of disintegrants. And the examiner, in this examiner-initiated interview, proposed amending, narrowing the claims dramatically from at least one binder and at least one disintegrant to Marcouche groups comprising the specific binders and specific disintegrants that were disclosed in the specification. I think I now understand what I understood before you said something. I don't think your argument depends on what you asserted about how there was a rejection even after an initial addition of the absolute weight of the sinicalcid. So I took it that the record showed that the examiner rejected the original claims, the post-preliminary amendment claims. The only thing we know is that the examiner said, I now see there's an absolute weight of sinicalcid, and I would like to add the identification of particular excipients. And with that, that whole combination, it's enough. Yes. And, Your Honor, if I may, I believe reasonably inferred that he maintained the rejection because if he had not, he would have allowed the claims without those additional Marcouche claim amendments. He would have said, yes, the narrowing of the amount of sinicalcid is sufficient to overcome the prior art. He didn't do that. He made very substantial narrowing claim amendments that Amgen agreed to. Amgen says it wasn't for reasons of patentability because we later put in this. Right. I think their problem is that the record doesn't really tell you that it wasn't for reasons, that these pieces weren't for the reasons, with one possible exception, and that is their argument about how the three pieces of prior art contained all of these. So this part could not possibly, this part, the addition of the identity of binder and disintegrant excipients, could not possibly have been part of the reason to overcome the prior art rejections. That is Amgen's argument. Right. So can you tell me why they're wrong about that? Yes. They're wrong because the prior art, one, leaving aside the Van Wagenen reference, which disclosed sinicalcid, and going to the Sue reference, HSU, that reference disclosed 10 binders and 12 disintegrants. You multiply those together, you get 120 binder-disintegrant combinations. The other reference, Creekmore, disclosed 19 binders and 8 disintegrants, and I'm not going to try the math in my head, but it's around 140 binder-disintegrant combinations. The claims, Amgen's claims, were narrowed to recite 3 binders and 4 disintegrants. That's 12 combinations. With sinicalcid. And the examiner said in his statement of reasons for allowance, the prior art does not disclose these specific combinations. Right. Help me unravel a confusion. Tell me why it would be wrong to say as long as any one of the ultimately selected binder-disintegrants appeared in the prior art, the prior art would stand as an objection to these claims. Well, because the prior art also disclosed hundreds of other combinations, and a separate reference disclosed sinicalcid, so there was no anticipation rejection here. It was an obviousness rejection that relied upon combining disparate references. Is there any evidence to show that this particular formulation has properties unexpected over the formulation of this compound? These are all standard agreements. No, Your Honor, because the parties agreed to bifurcate the trial into infringement and then validity later. And the parties agreed that the court would try infringement first, so we didn't reach questions of validity and evidence of unexpected results, therefore it wasn't presented to the court. All right. Thank you. Thank you. Mr. Haldreth? Thank you, Your Honor. Different points, I assume? Yes. I'm going to address the finding by the district court that there is no listed binder present in Amnil's proposed formulation. There was an entire failure of proof on that element. I'm Jake Haldreth. I represent Amnil. The Amnil case was decided, among other things, on a non-infringement finding that Opadry is not HPMC, the listed binder to which Amgen equated it. They are different molecular entities with different functions. And just as salt. What do you mean different molecular entities? HPMC is HPMC, right? Correct, Your Honor. And Opadry. That's the same molecular entity. The presence of 8% something else is different. But HP hydroxypropyl methyl cellulose is just that, right? Well, Your Honor, this is a fact issue. It was hotly disputed. What the district court found is that Opadry is a molecular dispersion of HPMC with two grades of polyethylene glycol. And if you were to simply mix PEGS and HPMC, you would get a slurry. They're miscible, but they don't form a solution. A physical slurry. Correct. Not a chemical reactant. Exactly. Opadry is made by a proprietary process, which creates a molecular dispersion of those three ingredients. And that molecular dispersion has completely different properties, different functions from HPMC that were just mixed with PEG. And that was the subject of extensive testimony and factual findings. What the district court found was, and it is at page 14 of his decision in Appendix 16, the excipients have different chemical structures, physical characteristics, binding mechanisms, and commercial sources. HPMC is a single molecule, whereas Opadry is a molecular dispersion of three distinct chemical ingredients. The testimony on that was really the subject of both experts, almost their entire testimony. That's found in the cross-examination of Amgen's expert in the appendix at 3610-3652, direct examination of Ammiel's expert at the appendix at 3955-4027. And there was testing from Ammiel's product development that showed that HPMC as a binder in Ammiel's formulation did not release the drug in a satisfactory release curve on dissolution, but that Opadry did, so that they fundamentally behaved differently with respect to a critical function of the final formulation. This really is just a fact dispute that was resolved in Ammiel's favor on substantial evidence, Your Honors. One last quick point. Counsel said that where a single excipient like PGS has a quote-unquote secondary function, it should count for both functions, for example, a binder and a disintegrant. That's a fact issue, whether it has a secondary function. What the trial court found here with respect to Ammiel, as a separate independent ground of non-infringement, is that PGS in Ammiel's formulation, in the ratio that it's found, functions only as a disintegrant, not that that is its secondary function. And so that, too, is a fact finding that should not be disturbed on appeal. Thank you very much, Your Honors. Okay. Thank you. Let's give five minutes of rebuttal to Scott. Thank you, Your Honor. Counsel, we were talking earlier about at least one and whether that gets out from under the Marcouche limitation. But it's at least one selected from the group. So why isn't that governed by the Shire and multi-layer cases? No, because the at least one has to mean something, right? And so if you look at the end of that, at the end of the group it's something outside of the group. It's from that group. Okay, but then you also have to, in considering that question, you have to consider what does it mean at the end of that clause and mixtures thereof, right? And so mixtures thereof, just grammatically, would mean combinations of the excipients in the Marcouche group. I gather you always have one anyway from the group. Yes. And the question is whether also something from outside of the group does destroy compliance. Right, that's correct. And so what I'm saying is that the mixtures thereof and the at least one cannot mean the same thing, right? They have to have different meanings. They have to be presumed to have different meanings. And what we're saying, what our position is that the mixtures thereof take into account where you can have more than one of the listed excipients, but the at least one was intended to imply that you can have something else in there in addition to what's listed in the Marcouche group. Because otherwise you'd have to conclude that both of those terms mean exactly the same thing. And we should not be doing that because that's not proper claim construction, right? The at least one and the mixtures thereof, you can't say that they mean the same thing. And so they have to be different. And so when you look at the case law, the two cases that we cite, and there's no cases to the contrary on this. The cases that we're aware of, wherever it says at least something, a portion, at least one, in a Marcouche setting, that means that you're entitled to have unlisted excipients. What is your view of the pre-examiner amendment claims where it says, for example, from about 1% to about 5% by weight of at least one binder? I think that actually supports our position. What does that mean? Well, to me, that means that you need that percentage of at least one binder, but that there's other binders because of the at least language that you can have in there. So you do not read that as saying the sum total of binders must be between 1% and 5%? Correct. Now, let me just make one point that I think is an important one. I think a lot of this dispute centers around unlisted binders being something that's nowhere disclosed in the patent. That, as I said earlier, is different than the situation where you have a listed binder from another group that people are saying is an unlisted binder. And that, I think, takes care of the percentage question, Judge Taranto, that you're raising, because with respect to anything that's listed, it has to be governed by those percentages. And I think that the secondary function of a listed binder should not fall into the same category as unlisted binders that are nowhere disclosed in the patent. And really, by the teachings of the patent, don't necessarily need to be in... This goes to the starch issue of Rositas. Yes. Yes. Yes. Correct. And so I think the district court really went too far in a couple of different ways. Number one, by calling a listed binder, for example, saying a listed binder, if it has a secondary function, then it's outside the scope of the claim. So that was too far. And it was also too far to say that, well, you can't have anything else in there either, whether it's another listed binder or whether it's an unlisted something. And so those are two different issues. I think the result is the same in terms of the claim construction, but certainly the court's claim construction is wrong. And so it's just way too broad. And can I just double-check? Anne Neal's argument about OPA-DRI stands... Whether right or wrong, it stands independently of this claim construction issue. Is that right? That's correct. That's correct. So with respect to that, and I'll just jump to that if I may, one thing that we cannot ignore is the fact... And I think, Judge Lohrer, you were touching on this a little bit, right? OPA-DRI contains 92% HPMC. This court decided, after all of this fact-finding, that it was a distinct chemical entity. And you can take any substance and throw some distilled water in there and create a slurry, right? And, yeah, it looks different. It's not the original form, which may be a powder or something like that, but this is just what chemical formulations are about. So I don't think the question is whether they look different. It's whether HPMC is in the ANDA formulation, and it definitely is, because OPA-DRI is 92% and it's a distinct chemical entity. That's what the court found. And, look, we're not raising other factual issues here, right? Because it's difficult on appeal to deal with those, but this is one where the court committed clear error and it came out the wrong way, notwithstanding his factual finding on that. Counsel for Amniel talked about the secondary functions being irrelevant and all of this fact-finding on the secondary functions, and, again, I think that's where the district court went wrong, because the secondary functions should be irrelevant, especially on literal infringement. If you want to... It may be appropriate to get into that issue on doctrine of equivalence, but not on literal infringement. One thing I want to do is just touch a little bit on the prosecution history of Stoffel, if I may. And so we don't have to guess as to what the examiner and the applicant were up to. And so in the preliminary amendment, Amgen talked about how the rejections were made to place the claims in proper format and to better define the claims' subject matter, including equivalence. The examiner did not come back and dispute that, and there were at least three contacts between the examiner and the applicant after that. There were two notices of allowances and one interview. And so the examiner never disputed that. And then when we get to the end of this, and if you look very closely through the prosecution history, you follow what happened there, specific excipients were never an issue, all right? And, in fact, all of those excipients, in response, Judge Toronto, to your question, all of the excipients that are in each of those Marcouche claim elements were in the prior art. And, in fact, Creekmore, example number two, has at least one from each of the categories of the Marcouche groups of the claims. So all of those were in the claims. There was no change to the content of the Marcouche groups  There was no narrowing of those Marcouche groups. Did the prior art have them in these percentages? No, they didn't. So doesn't that somewhat weaken your point that these listings couldn't really distinguish the prior art? No, but there was no change in the claim. There was no change whatsoever. I mean, the claims included the percentages from the beginning, and there was no change whatsoever. And, again, we don't have to guess as to why the examiner allowed the claims, right? Because, and I'm referring to page A6, or appendix 1643, and so what the examiner there said is, claim compositions are distinguished from the closest prior art by incorporating precise amounts of calcium receptive active compound, sinicalcid HCL, right? So this is the narrowing of the active. The nature of the excipients, and previously when the examiner, during the office action, he called them ingredients. He didn't call them, he didn't talk about the nature. He repeatedly, though, during the prosecution, after the rejection, called the excipients. He referred to the nature, and then he says it's the nature of the excipients and their respective combinations. So what he's talking about there is the three categories, the combination of that, and the nature of these excipients. And so he's not talking about individual excipients. He's not talking about pre-gelatinized starch, which is the issue for Pyramol, and whether there was a specific narrowing of the claims based on starch being in the prior art. That never happened. And so there's no narrowing due to patentability, and at a minimum, at a minimum, it was tangentially related to the equivalent in the amendment. But we're not even saying that. We're saying that this was not narrowed for the purposes of patentability with respect to that particular element. Okay. Okay. Thank you. Now, Mr. Maddox, you asked for one minute on the cross-appeal, but we haven't really gotten to do it. I just watched him do seven, but yeah, that was one. Right? Two things. This is not the case to rewrite Marcuse's Law. He elided over it. Well, when it says at least one or at least a portion... Is that the cross-appeal, Marcuse's Law? Well, yeah. Our cross-appeal depends on affirming the claim construction, and what they are arguing is going to change Marcuse's Law tremendously because any time, according to them, if you use the phrase at least one of, which this court said you've got to use, otherwise we're going to limit you to just one in Abbott in 2003, you've opened up the Marcuse group. The cases Krish and Mannesman back in 1986, your case, the claim language was at least a portion of, and it was that particular claim language. Just, I mean, I guess I keep thinking they have one and only one point. The combination of at least one and mixtures changes the rule of how you interpret these things. Everything else, I mean, I think that's their one point. Why shouldn't it? Why shouldn't it? Because they're using the flags that this court told drafters to use, but you can have more than one thing in a composition without having a mixture of those two things. That doesn't follow that a combination of things is always a mixture. Isn't your answer that at least relates to what was recited, the same things? It's not outside of that. Yes, that would be my answer to a slightly different question, but yes, that would be my answer to your question, but I also gave you another answer to that. If the rule is going to be you want to cover having more than one and having mixtures of one, but if you put language of both the at least one and the mixture, you lose it all, then I guess we should make that rule and tell everyone about it very, very loudly because it would be so new and so different. There are times when you put clear construction and you say at least a portion of it. We're going to have to wrap it up. I think we're going to have to figure it out. Thank you all. The case is taken under submission. That concludes our arguments for this morning and afternoon. All rise.